CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
MICHAEL A. SCHACHTER. (Bar No. 298610)
(E-Mail:  Michael_Schachter@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, California  92701-4598
Telephone:  (714) 338-4500
Facsimile:  (714) 338-4520

Attorneys for Defendant
MICHAEL CULLIGAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 20-00263-AB |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT'S POSITION RE SENTENCING; EXHIBITS** |
| MICHAEL CULLIGAN | **Sentencing Date:  January 7, 2022** |
| Defendant. | **Sentencing Time: 1:30 p.m.** |

Michael Culligan, by and through his attorney of record, Deputy Federal Public Defender, Michael Schachter, submits his position regarding sentencing herein, which is based upon the attached memorandum, exhibits filed in support thereof, the presentence report, the documents and records on file in this matter, and any argument or evidence to be presented on this matter and which the Court may consider.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  December 27, 2021      By   */s/ Michael A. Schachter*

MICHAEL A. SCHACHTER
Deputy Federal Public Defender
Attorney for Michael Culligan

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................... 1

II. PROCEDURAL BACKGROUND ...................................................... 3

III. BRIEF FACTUAL BACKGROUND ............................................... 3

    A.    The stillbirth of Mr. Culligan's expected child, which occurred when Mr. Culligan was just a freshman in high school, devastated him and precipitated early drug dependency. ............................................. 3

    B.    Mr. Culligan's struggles with drug addiction deepened and sent him into a tailspin which lasted until his instant arrest. ...................... 4

    C.    Mr. Culligan's addiction to methamphetamine contributed to his instant offense. ................................................................................ 5

    D.    Mr. Culligan's time in custody has been defined by deep reflection about his conduct, and while he is devastated by the impact of his actions, he is planning for a different future defined by sobriety, family, and hard work. .................................................................. 6

IV. LEGAL STANDARD FOR IMPOSING A SENTENCE .................. 7

V. ARGUMENT ....................................................................................... 7

    A.    A two-point variance is appropriate to ensure that Mr. Culligan is treated similarly to others who received such variances, and to account for the excruciating pain he suffered from untreated dental conditions while housed at SLRDSC. .......................................................... 8

    B.    A term of 37 months in custody appropriately takes into account Mr. Culligan's background and is sufficient for punishment, deterrence, and protecting the public. ............................................................ 9

    C.    Recommendations for placement at Lompoc and participation in RDAP, together with supervised release conditions for continued substance abuse and mental health treatment, will provide support for Mr. Culligan as he continues his recovery. ............................... 10

VI. CONCLUSION ................................................................................ 11

# I.  INTRODUCTION

Michael Culligan's tragic conduct in this case represents the culmination of his more than a decade-long struggle with drug addiction.

At the time of his June 2020 offense, Mr. Culligan was still in the throes of an all-encompassing struggle with substance abuse that at the time permeated virtually every aspect of his life.  Today, the American Psychological Association identifies substance abuse as a recognized class of mental disorder.  *See, e.g.*, *U.S. v. Mosley*, 277 F. Supp. 3d 1294, 1295, 1297-98 (M.D. Ala. 2017) (Thompson, J.) ("Given the current psychiatric understanding that drug addiction is a disease, albeit a mental one, the court believes that a defendant who suffers from a drug addiction should be properly treated as having a mental disease or illness.").

In Mr. Culligan's case, his struggles began and were rooted in the stillbirth of expected child, which occurred during his freshman year.  The experience shattered him and triggered severe depression.  Mr. Culligan turned to drugs and alcohol, normalized by his friends in a town where they were widely available, as a misguided coping mechanism.  Drugs, and especially methamphetamine, seemed to make things better, but the inevitable result of Mr. Culligan's reliance on substances was that he was in a downward spiral for much of his life.

The defense does not in any way seek to minimize the tragic events of this case.  Nonetheless, his longstanding struggles with substance abuse provide essential context.  It is undisputed that at the time of the traffic collision, Mr. Culligan was under the influence of methamphetamine, and despite the horrific impact of his drug use, there is no evidence that Mr. Culligan in any way intended to hurt any other person.

To be sure, Mr. Culligan in no way views his drug addiction as an excuse.  Instead, as he thoughtfully writes in his letter, he accepts full responsibility for both his addiction and the devastating impact of his actions.

He is also putting in the necessary work.  As his letter makes clear, the devastating events of this case have for Mr. Culligan triggered near-constant reflection.

1

1   He has achieved sustained sobriety for the first time in his adult life.  But he knows

2   continued hard work will be essential, and he is committed to embracing any and all

3   opportunities for substance abuse and mental health treatment, as well as vocational

4   training, available to him during and after his time in custody so that he can live a new

5   and better life for himself and his family upon his release.

6          Against this backdrop, the defense respectfully submits that a 2-point variance

7   and sentence of 37 months' imprisonment is appropriate to ensure that Mr. Culligan is

8   treated similarly to others who received 2-point COVID variances during the pendency

9   of his case.  As discussed below, Mr. Culligan likely would have been eligible for such

10  a variance, which were routinely extended to most defendants, but during the timeframe

11  in which such offers were made the parties were engaged in discovery to ensure that the

12  Court had jurisdiction over this case, which of course was a prerequisite for the factual

13  basis of any plea agreement.  Further, and perhaps even more important, Mr. Culligan

14  has more than most others borne the brunt of the COVID-19 and its impact on those in

15  custody.  Because of overcrowding at MDC, he was transferred to San Luis Regional

16  Detention and Support Center ("SLRDSC").  There, and as discussed in the defense's

17  earlier filed unopposed *ex parte* application for an order requiring transfer from

18  SLRDSC to MDC for the evaluation and treatment of urgent dental conditions (Dkt.

19  No. 26), Mr. Culligan for months experienced excruciating pain from untreated

20  conditions.  Thus, a two-point COVID-19 variance makes even more sense for him

21  than for most defendants.

22         A sentence of 37 months is also appropriate because a longer sentence is not

23  needed for punishment, deterrence, or to protect the public.  As stated, Mr. Culligan's

24  struggles with drug addiction, while not an excuse, provide essential context for his

25  instant offense.  And, equally important, he is committed to building on his sobriety

26  through continued hard work during and after his time in custody.  Accordingly, in

27  combination with supervised release conditions for continued outpatient substance

28  abuse and mental health treatment, as ordered by the United States Probation Office,

2

the defense respectfully asserts that a sentence of 37 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

## II.  PROCEDURAL BACKGROUND

Mr. Culligan made his initial appearance before the Court on June 17, 2020. Dkt. No. 5.  On September 10, 2021, Mr. Culligan pleaded guilty to Count 1 of the Indictment, which charges him with involuntary manslaughter, in violation of 18 U.S.C. § 1112.  Dkt. Nos. 30, 32.

Under the parties' plea agreement, the parties agreed that the applicable Sentencing Guidelines yield a base offense level of 22.  Dkt. No. 30, ¶ 11.  The United States Probation Office calculates a total offense level of 19 and a criminal history category of IV, yielding a guideline range of 46-57 months.  PSR at 3.

Sentencing is scheduled for January 7, 2022.  Dkt. No. 32.

## III.  BRIEF FACTUAL BACKGROUND

### A.  The stillbirth of Mr. Culligan's expected child, which occurred when Mr. Culligan was just a freshman in high school, devastated him and precipitated early drug dependency.

Mr. Culligan was born in 1991 to a loving but overtaxed mother and a father who disappeared for virtually of all of Mr. Culligan's life.

Despite the absence of his father (who left when Mr. Culligan was around six years old), Mr. Culligan enjoyed a relatively happy childhood.  He has tremendous respect for his mother Susan, who worked extremely long hours, often at two jobs, to support the family.  Mr. Culligan also formed a unique and loving bond with his aunt Karen, who suffers from cerebral palsy and who has lived with the family for all of Mr. Culligan's life.  And while Mr. Culligan longed for a father figure throughout his childhood, his early years were in general defined by positive memories of playing sports and spending time with family and friends.  *See* PSR, ¶¶ 46-47, 50; Ex. 1, Michael Culligan Letter;

But Mr. Culligan's life took a sharp turn during his freshman year of high school,

when he and his girlfriend were expecting a child.  Despite Mr. Culligan's young age, he was excited to become a father and the couple's families were making all of the necessary preparations necessary to welcome their expected child into the world.  But, tragically, the baby was stillborn when Mr. Culligan's girlfriend was about 8.5 months pregnant.  *See* PSR, ¶ 51; Ex. 1, Michael Culligan Letter.

In the wake of these events, Mr. Culligan developed a severe depressive disorder. At first, he sought help from school counselors and a therapist, but when he did not find relief there he turned to drugs to numb the pain, viewing them as his "only escape." Mr. Culligan started with cocaine, marijuana, and alcohol, and then began using methamphetamine a few years later, which he has struggled with for most of his adult life.  *See* PSR, ¶¶ 62-64, Ex. 1, Michael Culligan Letter.

**B.     Mr. Culligan's struggles with drug addiction deepened and sent him into a tailspin which lasted until his instant arrest.**

The negative impact of Mr. Culligan's emerging substance abuse disorder cannot be overstated.  It took over virtually every aspect of his life.[1]  For example, Mr. Culligan's substance abuse coupled with his depression caused him to fall behind in school and ultimately led to his not graduating after he aged out of a continuation school.  *See* PSR, ¶ 65, Ex. 1, Michael Culligan Letter.[2]  Mr. Culligan also struggled to find consistent work.  *See* PSR, ¶¶ 66-70.  And once he began using methamphetamine every day, he began committing crimes to support his addiction.  *See* Ex. 1, Michael

---

[1]     As Mr. Culligan's aunt Kathy puts it: "My nephew is a very sensitive and self-conscious young man who, like so many in his small town, had an addiction to drugs.  Michael has suffered a lot of disappointments, learning disabilities and loss in his life.  He's the kind of person you think about and you think, 'he's such a nice kid, he's just lost!'"  Ex. 3, Kathy Canario Letter.

[2]     Undersigned counsel understands through his investigation of this case that Mr. Culligan also had an IEP and suffered from dyslexia, which may have also impacted his ability to keep up in combination with his depression and substance use disorders.

4

Culligan Letter; PSR, ¶¶ 36-39.

Notwithstanding Mr. Culligan's struggles, there were two notable bright spots. First, for years up until his arrest, Mr. Culligan spent about seven hours every day taking care of his aunt Karen, who is dependent on her family for support.  Mr. Culligan prepared meals for her, cleaned for her, arranged her medications, and helped her with errands, among other tasks.  Mr. Culligan even set up a "Wonderland Room" for Karen full of items she loved to make her more comfortable.  According to Mr. Culligan's mother Susan, Mr. Culligan's help was essential for making it possible for her to work long hours so that the family could pay its bills and mortgage.  PSR, ¶ 49; Ex. 2, Susan Culligan Letter; Ex. 3, Kathy Canario Letter.

Second, Mr. Culligan enjoys a strong bond with his nine-year-old son.  While Mr. Culligan's substance abuse disorder and resulting employment struggles negatively impacted his ability to provide financial support, Mr. Culligan nonetheless consistently spent every other weekend with his son.  Mr. Culligan loves his son and looks forward to being the best father he can be following his release from custody.  PSR, ¶ 53; Ex. 1, Michael Culligan Letter.

## C.   Mr. Culligan's addiction to methamphetamine contributed to his instant offense.

As stated, the defense does not in any way seek to minimize the tragic events of this case, nor does Mr. Culligan.  His letter to this Court as well as those of his family members reveal his deep recognition of the fact that he will have to find a way to live with the weight of his actions for the remainder of his life.  *See* Ex. 1, Michael Culligan Letter; Ex. 2, Susan Culligan Letter; Ex. 3, Kathy Canario Letter.

Nonetheless, for sentencing purposes, it is important to understand the impact that Mr. Culligan's struggles with substance abuse had on his offense conduct.  Here, it is undisputed that at the time of the traffic collision, Mr. Culligan was under the

influence of methamphetamine,[3] and despite the horrific impact of his drug use, there is no evidence that Mr. Culligan in any way intended to hurt any other person.  *See* Dkt. No. 30, ¶ 9; PSR, ¶¶ 2, 17; Ex. 1, Michael Culligan Letter.

> **D.    Mr. Culligan's time in custody has been defined by deep reflection about his conduct, and while he is devastated by the impact of his actions, he is planning for a different future defined by sobriety, family, and hard work.**

Mr. Culligan has spent his time in custody in near-constant reflection.  He has for achieved and preserved an extended sobriety for the first time in his adult life and, looking backward is able to see "how much of a mess [he has] made of [his] life."  Ex. 1, Michael Culligan Letter.  He describes his offense as "something [he] struggle[s] with every day" and recognizes that it will continue to impact him for the rest of his life.  *Id.*; *see also* Ex. 2, Susan Culligan Letter.

Crucially, Mr. Culligan plans to take his newfound sobriety extremely seriously. He hopes to complete the RDAP program while in custody and will likewise embrace any other opportunities for substance abuse and mental health treatment while in custody.  He also intends to obtain a job and any available vocational training available so that he can hit the ground running upon his release.  And he appreciates that it will be essential for him to continue building on his sobriety after his release, which will require continued hard work and treatment.  Finally, he also recognizes the importance of surrounding himself with the love and support of family and friends as he takes on this endeavor.  In short, for the first time in his adult life, he "like[s] the person" he is becoming but knows that continued improvement will be necessary to make him "the best father, son, and brother," which he writes that his "family most definitely

---

[3]    The deceased's toxicology report reflects that he was also positive for drug use at the time of the accident.  While this does not in any way excuse Mr. Culligan's conduct or criminal liability, these results suggest the possibility that his being under the influence could have also been a contributing, albeit secondary, cause.

1  deserves."  Ex. 1, Michael Culligan Letter.

2  **IV.  LEGAL STANDARD FOR IMPOSING A SENTENCE**

3       Following *United States v. Booker*, 543 U.S. 220 (2005), it is well settled that the

4  Sentencing Reform Act of 1984, rather than the Sentencing Guidelines, governs

5  sentencing decisions.  *Id.* at 260-61; 18 U.S.C. § 3553(a).  The Guidelines are no longer

6  the only or even primary consideration in fashioning a sentence in a particular case.

7  Instead, they are purely advisory.  *Id.*  As a result of this paradigmatic shift, a court's

8  choices in sentencing a particular defendant have been greatly expanded.  *Cunningham*

9  *v. California*, 549 U.S. 270 (2007).

10       The "overarching" directive of sentencing is that "[t]he court shall impose a

11  sentence sufficient, but not greater than necessary, to comply with the purposes [of

12  sentencing]."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  This "parsimony

13  principle" is not mere precatory language, but is a key – in fact, *the* key – requirement

14  that a sentence must satisfy.  *See also Nelson v. United States*, 550 U.S. 350 (2009) (per

15  curiam) (reaffirming prior opinions stating that guidelines are not to be presumed

16  reasonable); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc)

17  (sentencing guidelines to be given no more weight than any other § 3553(a) factor).

18       Where a sentencing court determines that a defendant should be sentenced

19  outside the Guidelines range, the court need not justify the variance based upon

20  "'extraordinary' circumstances."  *Gall v. United States,* 552 U.S. 38, 47 (2007).

21  Neither must the court apply "a rigid mathematical formula that uses the percentage of a

22  departure as the standard for determining the strength of the justifications required for a

23  specific sentence."  *Id.* at 595.  Instead, the sentencing judge need only "consider the

24  extent of the deviation and ensure that the justification is sufficiently compelling to

25  support the degree of the variance."  *Id.* at 597.

26  **V.  ARGUMENT**

27       A sentencing court must consider all of the statutory factors, not just the

28  guidelines, in arriving at an appropriate sentence.  Here, the defense respectfully asserts

7

1    that when the factors set forth in 18 U.S.C. § 3553(a) are considered, a sentence of
2    imprisonment for 37 months is sufficient to achieve the purposes of sentencing.

3        **A.    A two-point variance is appropriate to ensure that Mr. Culligan is**
4              **treated similarly to others who received such variances, and to**
5              **account for the excruciating pain he suffered from untreated**
6              **dental conditions while housed at SLRDSC.**

7        As stated, the defense respectfully submits that a 2-point variance is appropriate
8    to ensure that Mr. Culligan is treated similarly to others who received 2-point COVID
9    variances during the pendency of his case.

10       As noted, Mr. Culligan likely would have been eligible for such a variance,
11   which were routinely extended to most defendants, but during the timeframe in which
12   such offers were made the parties were engaged in discovery to ensure that the Court
13   had jurisdiction over this case.  This, in turn, required a fact-intensive analysis of the
14   site of the accident and whether that location was within the geographic boundaries of
15   federal jurisdiction, which have changed at numerous points over the last several
16   decades.[4]  Confirming there was jurisdiction was a prerequisite for the factual basis of
17   any plea agreement, but it took time for the parties to make this determination.

18       Moreover, as stated, Mr. Culligan has more than most others borne the brunt of
19   the COVID-19 and its impact on those in custody.  Overcrowding at MDC led to his
20   transfer to SLRDSC, where he for months experienced excruciating pain from
21   untreated dental conditions, as discussed in the defense's unopposed *ex parte*
22   application seeking his return to MDC for evaluation and treatment of those conditions.
23   *See generally* Dkt. No. 26.  As discussed extensively in the Declaration of Victor
24   Gomez (an investigator on Mr. Culligan's defense team) supporting that application,
25   the locus of Mr. Culligan's pain was in two abscesses, which were at the sites of two

26   _____

27       [4]    Indeed, a few years ago the government dismissed a similar case alleging
28   involuntary manslaughter, which occurred just down the street, after the parties
     determined that the accident had taken place outside of federal jurisdiction.

teeth which a dentist at SLRDSC told him needed to be extracted, but which were only extracted months later after dozens of contacts from Mr. Gomez to USMS. Initially, SLRDSC reportedly held off in performing the extractions or any treatment for months because it claimed it needed authorization from USMS to perform them. Between March 12, 2021 and June 1, 2021, the defense team contacted USMS more than a dozen times to ensure that Mr. Culligan receive the treatment he desperately needs as soon as possible. On a few occasions, USMS reported that Mr. Culligan would be seen by a dentist in the near future for treatment but, as discussed in Mr. Gomez's declaration, these dates regularly passed without Mr. Culligan receiving treatment. Further, even after this initial treatment, Mr. Culligan continued to feel unbearable pain in his jaw, eye, temple, and head any time that solids or liquids in his mouth made contact with the two abscesses that were still present in his mouth. *See generally* Dkt. No. 26; PSR, ¶ 58. Notably, Mr. Culligan did not experience relief from his pain or the follow-up treatment necessary until this Court's order requiring that he be returned to MDC and that he be evaluated for follow up treatment.

Accordingly, for the above reasons, a 1-point COVID-19 variance is appropriate and makes even more sense for Mr. Culligan than for most defendants.

**B.    A term of 37 months in custody appropriately takes into account Mr. Culligan's background and is sufficient for punishment, deterrence, and protecting the public.**

The sentence this Court imposes must consider "the history and characteristics of the defendant" and "the need for the sentence imposed . . . to provide just punishment for the offense . . . to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C). Here, a term of 37 months in custody is sufficient to meet these objectives.

As discussed at length above, Mr. Culligan's longstanding and deep-seated struggles with drug addiction, while not an excuse, provide essential context for his instant offense as well as his earlier offenses. And he is committed both during and

after his time in custody to doing whatever is necessary to address this root cause so that he can live a different life going forward. Accordingly, in combination with supervised release conditions for continued outpatient substance abuse and mental health treatment, as ordered by the United States Probation Office, a sentence of 37 months' imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

      **C.**      **Recommendations for placement at Lompoc and participation in RDAP, together with supervised release conditions for continued substance abuse and mental health treatment, will provide support for Mr. Culligan as he continues his recovery.**

The sentence this Court imposes must consider "the need for the sentence imposed . . . to provide [Mr. Culligan] with needed educational or vocation training [and] medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

Here, the defense respectfully requests that the Court recommend Mr. Culligan be placed at Lompoc. The defense believes that this facility is likely to have an ideal combination of treatment and vocational training, which will greatly benefit Mr. Culligan. Additionally, this facility's location in Mr. Culligan's hometown will ensure that he is able to maintain his relationships with family and friends, which will likewise set him up for success during and after his time in custody.

For similar reasons, the defense requests that the Court recommend Mr. Culligan be invited to participate in RDAP. While Mr. Culligan has achieved sobriety on his own, RDAP or a similar program is essential for helping him to build on his success.

Finally, the defense proposes that the Court include supervised release conditions for continued outpatient substance abuse and mental health treatment, as ordered by the United States Probation Office, to further support Mr. Culligan in his recovery and, again, to build on the foundation of sobriety he has obtained while in custody.

# VI.  CONCLUSION

Accordingly, for the foregoing reasons and any additional reasons presented at the sentencing hearing, the defense respectfully requests that the Court impose a sentence of 37 months' imprisonment, which is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  December 27, 2021   By       */s/ Michael Schachter*
                                    MICHAEL SCHACHTER
                                    Deputy Federal Public Defender
                                    Attorney for Michael Culligan

11